on behalf of the eight appellants in this case, Adrienne and Daniella Ene. Your Honor, this is a case which involves the termination of the asylum status of Adrienne Ene. Could you raise your voice a little? I'm having some difficulty hearing you. Okay. I'm sorry, Your Honor. That's okay. That's better. This case involves the termination of the asylum status of Adrienne Ene. And this revolves around an affidavit, an affidavit which was submitted to the government after Mr. Ene was granted his asylum, in which a Mr. Powell recants his first affidavit that was part of the first case. Now, there's a lot of confusion as to this affidavit. The judge in her ruling in April of 2014, on page 10, makes reference to the affidavit and says not only did she consider the first affidavit that was filed, but also the second at the first hearing. That is not the case. Well, counsel, let me ask you before you go any further, what is our standard of review here? Well, your standard of review, Your Honor, is that you can look at the judge's written ruling and you can look at whether she made an error as to the affidavit, whether she weighed the affidavit. Are you suggesting the Novo review? Not the Novo. Substantial evidence, correct? Correct. All right. So. I think it's a substantial error, Your Honor, because if you look at the judge's decision in 2015, the sole basis that she terminates the asylum claim is based on the affidavit. The other issues that the government raised in its brief pertaining to the medical affidavits, the ledger, the statement as far as his asylum application, the judge in her ruling on page 8 states that the government failed to meet their burden. So the government failed to meet their burden on all those counts. The government can't come back and re-argue that like it did in its brief because it did not appeal this case. We did. So the only issue. I'm not sure I understand the significance of your argument about the affidavit. It simply says we have not issued a certificate in the name of N.A., nor is he a member of the association. Are you challenging that finding? Well, we're challenging the finding, Your Honor, because we don't believe that our client had his due process rights of being able to cross-examine the individual that took the statement, which was Counselor Michael Maitz. And the person that talked about the actual affidavit, how it was signed, was the DHS agent, Carol Webster. Mrs. Webster in her testimony made a series of errors. She's not able to let us know how this affidavit was conceived, what the surroundings were. But, Counsel, didn't the I.J. continue the hearing in order to allow your clients an opportunity to obtain whatever evidence, excuse me, whatever evidence they sought to counter the affidavit? Well, Your Honor, I don't understand why the burden was shifted to my client. The government had a counselor meet with Mr. Powell, Mr. Powell, okay? The government could have easily made him available via phone from the counselor to be, you know, to be cross-examined, Your Honor. But that's not required. It's not required, Your Honor. But, Your Honor, how is my client supposed to issue a subpoena to someone in a foreign country, number one, that he hasn't been in for 10 or 11 years? I thought the clients represented that they would be able to contact the individual. My client was unable, was unable to get to Mr. Powell. Well, so if your client was unable to get to that individual, why do you think the government should have had the obligation to produce someone? Well, because the government did get to that individual, Your Honor. It got to that individual and had him sign an affidavit. The government has a consulate. The government found this individual. The government brought him to the consulate. The government had him sign the affidavit. Now the government claims that they can't bring him to the consulate so that he can pick up a phone and be part of this via phone, as Mrs. Webster was. Why was it that your clients couldn't contact the individual? Maybe that's the same reason the government couldn't. Well, my clients have not been in that country for well over 13, 14 years. The government has a consulate. The government has officials there. The government reached out before. And the government did not even make Mr. Mapes available. And the government claims they can't find Mr. Mapes that was an employee of the government, but yet my client is supposed to find Mr. Pavel 14, 15 years after the fact and get him to testify in this case. Are you talking about the consular, the letter? Correct. And you regard that as the critical? Well, it is critical in this sense. Had there been an affidavit and a written report by Mr. Mapes as to what went on and the reasons that Mr. Pavel gave and the issues that were talked about, at that point Mr. Mapes wouldn't need to be present. But the only thing that was given was the affidavit. When Carol Webster was asked, you know, did Mr. Mapes himself speak to Mr. Pavel? Did he understand the language? She said yes, and then she said no, and then she said maybe it was Mr. Chapman. But we know that there was a criminal conviction, don't we? Here. With respect to the lawyer? With yes, however, Your Honor, all the evidence that Carol Webster introduced the trial concerning the ledgers, concerning what was introduced at trial, the government refers to as counts 9, 10, and 11. The judge, in her order on page 8 of the March 27, 2015 order, specifically states the government failed to meet their burden. What does that mean? Does that mean that that evidence was not accepted? That the judge found that the evidence did not meet the burden of the government. Did that mean that the evidence was not accepted as proof? Because we're looking for substantial evidence to support the decision. So if that evidence is in the record, that evidence can be considered, correct? Correct. Right in page 8, Your Honor, in the judge's ruling, all those issues, all those issues the government brought, the judge says they have not met their burden. As to the medical certificates, as to the ledger, and as to his statement in the asylum application. Which decision? What's the date of the decision that you're referencing? This is the March 27, 2015 decision, Your Honor. If you go to page 8, the middle of page 8, the third paragraph beginning next, the court analyzes the medical certificate that was submitted. I don't know. I thought the court found that DHS had demonstrated that the letter. The letter, yes, Your Honor. The other issues, no. But I think there are a series of issues of confusion even by the judge as to the value of the letter. But if the letter is fraudulent, isn't that sufficient evidence for the immigration judge to determine that there was fraud in the application? Well, Your Honor, our argument here is the letter was hearsay. That's one. If we reversed every decision on the grounds of hearsay, the rules of evidence, formal rules of evidence. Well, Your Honor, this is two or three times removed from the normal hearsay, because the letter was, the affidavit was introduced, but the man that took the affidavit, Mr. Mates, never testified to it. The only person that testified was Carol Webster, and Carol Webster had a limited phone conversation. So you are correct. Had the affidavit been introduced, the government would not have to produce Mr. Pavel. Okay? Both of us are in agreement there, because the immigration courts can't take hearsay testimony. Okay. But at the minimum, they should have produced Mr. Mates that actually took the affidavit. All right, counsel, you've exceeded your time. We'll give you one minute for rebuttal. Thank you. All right. May it please the court, Victor Lawrence, on behalf of the acting attorney general. This court should deny this petition for review, as substantial evidence demonstrates that the Department of Homeland Security met its burden to show fraud in Mr. Eanes' asylum application, and also his ineligibility for asylum when it was granted. First, to correct my opposing counsel before I continue into my argument, at page 8 of the immigration judge's opinion that he was citing to, if you look at the first sentence of the second paragraph, he was down on a third. The first sentence of the second paragraph says the court is satisfied that DHS met its burden to show by preponderance of evidence that Respondent's asylum application contains fraud. So that discounts a lot of the things that my opponent said yesterday. She was unsatisfied with the medical certificates and some other issues with the ledger, but with respect to the general proposition. The ledger that was in the home. I'm sorry? The ledger that was recovered from Casa's home. Correct. Correct. But she relied on many things to find that the asylum application itself was fraudulent. First, there was the fact of the criminal trial of Secone and Secone in which his lawyer, the same lawyer that represented Mr. Eanes, not this lawyer, not I, was convicted of asylum fraud. He manufactured Romanian asylum claims. And if you look at the record at page 530 and 531, you have the criminal complaint in which not only do they say that Mr. Secone committed asylum fraud, but he committed asylum fraud with respect to Mr. Eanes' application. So it's all tied together. And in the complaint, it only refers to the letters AE, but we have the testimony of Agent Webster who indicated that AE was, in fact, Mr. Eanes. So 530 and 531 is the criminal complaint that shows, that alleges there was fraud on the application of Mr. Eanes. And at 540 of the record, it shows that Mr. Secone pleaded guilty to that, or was found guilty for false statements in an asylum application. And at page 544 of the record, Mr. Caza is found guilty with respect to counts 9 and 10. So what we have then is a showing that there was fraud in the original asylum application under the standard, and yes, Your Honor, it is a substantial evidence review. We next go to the next question of whether he would have been eligible at the time the asylum was granted. He didn't argue that. He didn't argue that. I don't think he got to that, no. But that is. We do not need to either. Exactly. Okay. Can you explain? The argument was centered on the declaration from Pavel. Yes. And saying that he didn't write the letter that was originally introduced. I don't quite understand the role of Mr. Maitz in all of this. The argument seems to be he should have been called to authenticate something. Can you explain what that's all about? How was Mr. Maitz critical to this? His testimony I don't think was critical at all. But in other words, this argument of hearsay, which again, in immigration proceedings, we don't go by the Federal rules of evidence. So it shouldn't be considered hearsay. But Mr. Maitz was the individual who interviewed Mr. Pavel in Romania and asked him about the original declaration, which is found at 646 of the record, the declaration that was submitted with the asylum application from Mr. Pavel. He asked him about that, and Mr. Pavel said, no, I never issued that, and this person, Mr. Eane, is not a member of our association. So that completely eviscerated the claim that Mr. Eane was a member of the Jehovah's Witnesses or that particular association. So Maitz was the consular official who interviewed Pavel? That's correct. And then he submitted the declaration saying that this was not true. That's correct. He submitted that to Webster, and Webster explained to the court, to the immigration court, that entire process. Opposing counsel's position is that there was a due process violation. What's your response? There is no due process violation, because his due process violation is based on a hearsay issue, saying that Mr. Maitz. Well, no, it was partly, but it was partly based on the fact that the government did not make Mr. Maitz available. Right. And there's indications in the record, and I apologize, I don't have the exact page cite for this, that Mr. Maitz no longer worked for the State Department at the time of the immigration's decision in 2000, the immigration testimony in 2014. So he was not an employee of the State Department, and therefore he couldn't testify, or there's all sorts of regulations involving whether an employee can testify when he's no longer a member of that particular agency. I don't even know if he worked for the government at that particular point. It's just not in the record. But he did not work for the Department of State. And that's the reason, one of the reasons why he didn't testify, aside from the fact that it's very sufficient to show under the presumption of regularity, this Court's decision, and Engov particularly shows this, that, you know, the testimony or the presumption of regularity with respect to what consular officers do on a regular basis is something that really, unless there's other indicia of something going on, it should be trusted. And this Court always trusts, for instance, State Department reports. Sotomayor, I wouldn't say always. I take it back. This Court frequently trusts the country reports from the Department of State, which in fact are written by consular officers. They're considered reliable documents. But this was essentially issued by, signed by Maitz in the regular course of his business as consular official, isn't it? That's exactly right, Your Honor. And that's why it's a reliable document. Right. Well, what it is, it's a translation of the written statement, isn't it? Yeah. Right. That's correct. It's a translation of what Mr. Pavel himself wrote. Exactly. Yeah. In which Mr. Pavel was longhand in Romanian. Yes. Right. And so Pavel specifically said that this person is not a member of our association, whereas the original declaration said he was. And there's no reason why, no reason to suggest why Mr. Pavel would have lied. There's some testimony that Mr. Eane believed that he was coerced, but that's purely testimony that hasn't been corroborated. The testimony shows, as Your Honor pointed out, that even the immigration judge offered to subpoena Mr. Pavel to get his testimony. Mr. Eane never took him up on that. She had a continuance to allow him to get additional evidence from Mr. Pavel. That never was obtained or provided to the immigration court. Therefore, what the immigration court had was simply a declaration or an affidavit from Mr. Pavel that was translated by Mr. Mates, which showed that the original document suggesting that Mr. Eane was a Jehovah's Witness in Romania was a fraud. Right. And we have the uncontroverted record that the attorneys were engaged in fraudulent immigration activities. That's correct, Your Honor. And Your Honor was on the panel on the appeal of the Sekanon-Sekanon case back many years ago. So with all that, I think that the respondent has met his burden of showing that there's substantial evidence in the record to show that DHS met its burden of fraud in the original asylum application and in ineligibility for asylum at the time it was granted. If the court doesn't have any other questions, we'll rest on that. Thank you, counsel. Thank you very much. Thank you. One minute for rebuttal. Your Honor, even if Mr. Mates was not working at the State Department at that time, the government could still have issued a subpoena to have him come into court. But what I'd also like to do is look at the weight the judge gave this affidavit. If we look at the original ruling in 2004, a series of affidavits were given beyond this affidavit, attesting to my client's his membership in the church. The judge in her decision never referenced the affidavit as grounds as to why she granted this asylum. It was not material. The judge then goes on in her April 2015 decision to say it was material and I examined both the first affidavit and the second affidavit at the first hearing. The BIA in footnote 5 says clearly the judge is in error because that was never made available to the court in 2014. So she's saying in 2015 that the affidavit played a role in her decision, but it really didn't. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is Kim v. United States.
judges: Schroeder, O'scannlain, Rawlinson